**IN THE UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

**JEAN W. HINDLE,**

**Plaintiff,**

**vs.**                                        **Case No. 4:09cv422-RH/WCS**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

**Defendant.**

_____/

**REPORT AND RECOMMENDATION**

This is a social security case referred to me for a report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D. Loc. R. 72.2(D).   It is recommended that the decision of the Commissioner be reversed and the Commissioner be ordered to grant Plaintiff's application for benefits.

**Procedural status of the case**

Plaintiff, Jean H. Hindle, applied for disability insurance benefits.  Her last date of insured status for disability benefits is December 31, 2011.  Plaintiff alleges disability due to impaired memory from several brain aneurysms, painful diabetic polyneuropathy, and fibromyalgia, with onset on October 6, 2005.  Plaintiff was born in September, 1957,

was 48 years old on the alleged onset date, has two years of college, and has past relevant work as a database administrator, computer programmer, and a technical support specialist.

The Administrative Law Judge found that Plaintiff had the residual functional capacity to do a limited range of light work,[1] with no climbing, occasional balancing, stooping, kneeling, crouching, or crawling, avoidance of dangerous work hazards, and performance of only routine, repetitive tasks due to memory difficulties and cognitive dysfunction. She found that with these limitations, Plaintiff could do light work as an officer helper, ticket seller, and mail clerk, and sedentary work as a surveillance systems monitor, charge account clerk, and ticket seller. She concluded that Plaintiff was not disabled.

**Legal standards guiding judicial review**

This court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles. Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986). "Substantial evidence is more than a

---

[1] The Commissioner's rules define "light work" in part:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. §§ 404.1567(b) and 416.967(b).

scintilla, but less than a preponderance.  It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." <u>Bloodsworth v. Heckler</u>, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); <u>Moore v. Barnhart</u>, 405 F.3d 1208, 1211 (11th Cir. 2005).  "The Commissioner's factual findings are conclusive if supported by substantial evidence." <u>Wilson v. Barnhart</u>, 284 F.3d 1219, 1221 (11th Cir. 2002).  "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it." <u>Phillips v. Barnhart</u>, 357 F.3d 1232, 1240, n. 8 (11th Cir. 2004) (citations omitted).  The court must give "substantial deference to the Commissioner's decision." <u>Dyer v. Barnhart</u>, 395 F.3d 1206, 1211 (11th Cir. 2005).  "A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which support the ALJ.  A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ." <u>Tieniber v. Heckler</u>, 720 F.2d 1251, 1253 (11th Cir. 1983).  "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.' " <u>Cowart v. Schweiker</u>, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

A disability is defined as a physical or mental impairment of such severity that the claimant is not only unable to do past relevant work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 423(d)(2)(A).  A disability is an

"inability to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death or

which has lasted or can be expected to last for a continuous period of not less than 12

months . . . ."  42 U.S.C. § 423(d)(1)(A).  Both the "impairment" and the "inability" must

be expected to last not less than 12 months.  Barnhart v. Walton, 535 U.S. 212, 122

S.Ct. 1265, 1272, 152 L.Ed.2d 330 (2002).

     The Commissioner analyzes a claim in five steps.  20 C.F.R. § 404.1520(a)-(f):

1.     Is the individual currently engaged in substantial gainful activity?

2.     Does the individual have any severe impairments?

3.     Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404?

4.     Does the individual have any impairments which prevent past relevant work?

5.     Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of

the application for benefits.  A positive finding at step three results in approval of the

application for benefits.  At step four, the claimant bears the burden of establishing a

severe impairment that precludes the performance of past relevant work.  If the claimant

carries this burden, the burden shifts to the Commissioner at step five to establish that

despite the claimant's impairments, the claimant is able to perform other work in the

national economy.  Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050,

1052 (11th Cir. 1986).  If the Commissioner carries this burden, the claimant must prove

that he or she cannot perform the work suggested by the Commissioner.  Hale v.

Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

**Evidence from the administrative hearing**[2]

The administrative hearing was held on April 1, 2009, before Lisa Martin, Administrative Law Judge. R. 22. Plaintiff was 51 years of age at the time of the hearing. R. 28. She was found to be disabled and granted disability retirement through the Florida Retirement System. R. 27.

Plaintiff attended two years of college, and nearly has her AA degree. *Id.* She received vocational training in data processing. *Id.* Her immediate past relevant work was as a computer programmer and a database administrator for the Florida Department of Education. R. 29. Her job required that she "troubleshoot" computer problems. *Id.* She then took a job with the Leon County Clerk of Courts. R. 31. She worked there with a very large database. *Id.*

Plaintiff said that her disability is primarily the result of four brain aneurysms that injured her brain. R. 34. The last aneurysm was in 2007. *Id.* She went to Shands Teaching Hospital in Gainesville, Florida, and had it "clipped." *Id.* She could not remember the precise dates of that surgery, but the last surgery was in the Fall. R. 35. The ALJ then noted that the surgery had actually been done in November, 2006. R. 36. Plaintiff said that her first aneurysm occurred while she was in England, and then two

---

[2] Descriptions of the purpose and effects of prescribed drugs are from PHYSICIANS' DESK REFERENCE, as available to the court on Westlaw, or PDRhealth™, PHYSICIANS DESKTOP REFERENCE, found at < http://www.pdrhealth.com/drugs/drugs-index.aspx >. Information about medical terms and prescription drugs come from DORLAND'S MEDICAL DICTIONARY FOR HEALTHCARE CONSUMERS, available at: http://www.mercksource.com (Medical Dictionary link) OR MEDLINE PLUS, found at www.nlm.nih.gov/medlineplus/mplusdictionary.htm. The pages at these websites are not attached to this report and recommendation as the information is relatively well-settled, the precise definitions are not at issue in this case, and the definitions are not likely to be in dispute.

more occurred, one on either side of the first aneurysm.  R. 37.  Plaintiff said that this

has caused loss of short term memory.  R. 38.  Plaintiff said that she had to repeat

things 50 times before she can remember them.  R. 39.  She said:  "And it's not that I

don't want to remember it.  It's that I can't."  *Id*.

Plaintiff testified that when she awakes early, she dresses and takes her morning

medicine.  R. 39.  She then quietly leaves the house so that her husband, who is 85

years old, can sleep.  R. 40.  She drives to Hardee's restaurant and has breakfast and

takes her pills.  *Id*.  She said her diabetic neuropathy wakes her every morning, that her

"hands and feet scream at me."  *Id*.  She testified that after taking her medicine, she

reads a book but she cannot remember what she reads.  *Id*.  She said: "I mean, I can

read a book 20 times and I still can't remember everything in it, but I can tell you that I

enjoyed that book."  *Id*.  She said she cannot recall basic things, like basic plot lines or

details of the book.  *Id*.  After two days, she has forgotten that she read a particular

book.  R. 41.  Plaintiff said that she leaves "sticky" notes in her kitchen, on her front

door, and on the back door, to remind her about things that must be done that day, like

having her husband take his B12 shot on the first of the month.  *Id*.  Plaintiff said that

she had a plastic bag of medications in her wallet with her money, to remember to take

her medicines at breakfast.  R. 42.  She said she fills her medicine containers every two

days.  *Id*.  She said that if she pulls her wallet to pay at the counter and there is no

medicine in the bag, she knows that it is time to refill.  R. 43.  She keeps her

medications locked because there was a risk that her daughter will steal them.  *Id*.  She

said that she has to remember where she puts the key, but remembering is no problem

because this has become so automatic.  R. 43-44.

Plaintiff said that she takes Cymbalta[3] twice a day and Lyrica[4] three times a day for pain resulting from diabetic neuropathy.  R. 45.  She said that the most serious side effect from her medications is significant dryness of the mouth and thirst.  R. 48.  She said that if she forgets to take this medication, "it takes me two days to get past the pain again."  R. 45.  She said that these medications keep the pain "at somewhat of a lower level."  R. 46.  She said that she also manipulates Silly Putty to keep her mind off her pain.  *Id.*  She said she likes to crochet, but her hands currently hurt too much to crochet.  R. 47.  Plaintiff said that she takes Topamax[5] for migraine headaches, and it "really helps a lot."  R. 48-49.  She said that her migraine headaches can last for several days.  R. 49.  Plaintiff said she was very involved in a women's organization.  R. 50.  She said this helps take her mind off her physical ailments.  *Id.*

The ALJ posed a hypothetical to the vocational expert that contained the functional limitations he had found for Plaintiff's residual functional capacity, notably, light work limited to a "routine, repetitive type of work task."  R. 56.  The vocational expert said that such a person could not return to Plaintiff's past relevant work, R. 56,

---

[3] Cymbalta is used to treat major depression and diabetic neuropathy, a painful nerve disorder associated with diabetes that affects the hands, legs, and feet. Cymbalta is also used to treat generalized anxiety disorder and fibromyalgia. PDRhealth™, PHYSICIANS' DESKTOP REFERENCE.

[4] Lyrica is used in patients 18 years of age and older with nerve pain called diabetic neuropathy, postherpetic infection nerve pain, fibromyalgia (a condition in which there is widespread pain in the muscles and soft tissues surrounding the joints throughout the body), and in combination with other medications to reduce the incidence of seizures. PDRhealth™, PHYSICIANS' DESKTOP REFERENCE.

[5] Topamax is an antiepileptic drug, prescribed to control both the mild attacks known as partial seizures and the severe tonic-clonic convulsions known as grand mal seizures.  It is typically added to the treatment regimen when other drugs fail to fully control a patient's attacks.  PDRhealth™, PHYSICIANS' DESKTOP REFERENCE

but could do work as an office helper, SVP[6] two, unskilled, as a ticket seller, SVP two, unskilled, and as a mail clerk, SVP two, unskilled. R. 57-58. He said that if the person were to be limited to sedentary work, the person could work as a surveillance system monitor, SVP two, unskilled, a charge account clerk, SVP two, unskilled, and as a ticket seller, SVP two, unskilled. R. 58.

**Other evidence**

An interviewer for the Social Security Administration noted on November 7, 2005, that Plaintiff's appearance and behavior was remarkable for a lack of memory, and that Plaintiff had problems with talking, answering, coherency, and concentration. R. 133.

On January 9, 2006, another interviewer spoke with Brian Murphy, who was the supervisor of Gwen Lightfoot, who had been Plaintiff's work supervisor at the Leon County Clerk of Court. R. 155. Mr. Murphy said that Ms. Lightfoot had said that Plaintiff "no longer was able to perform at a normal pace due to inability to recall information or retain new information readily." *Id*. It was also noted that if Plaintiff had to learn new techniques, "she was unable to recall them a short time later and would have to seek help or 'retrain' herself on a procedure." *Id*. It was noted that her "memory problems were a significant impairment to her being able to perform her job any longer." *Id*.

**Medical evidence**

Plaintiff suffered her first brain aneurysm in the late 1980s. R. 222. In July, 2000, she had suffered a tibiofibular fracture from the fall when she had her second

---

[6] "The DOT lists a specific vocational preparation (SVP) time for each described occupation. Using the skill level definitions in 20 CFR 404.1568 and 416.968, unskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9 in the DOT." *See* SSR 00-4p, available at 2000 WL 1898704.

aneurysm. R. 215. On July 18, 2000, on discharge after treatment for the broken leg and second aneurysm, her treating physician said that "due to the length of this major medical experience, Ms. Hindle is quite weak globally and will require[] intensive physical therapy and occupational therapy along with speech therapy for rehab convalescence." R. 220.

On May 30, 2001, Plaintiff sought treatment at Shands HealthCare for a repeat arteriogram as a followup for a second aneurysm that she had had a year earlier. R. 222. Plaintiff reported that she suffered severe fatigue, which limited her workday to about six hours, and she said she had daily headaches and problems with short-term memory. *Id.* She said she also had paresthesias and pain in her toes. *Id.* Plaintiff's sensory examination was basically normal, but with slightly decreased sensation to both light touch and pin-prick in the right lateral leg below the knee. R. 223.

On July 25, 2002, Plaintiff saw neurologist Richard E. Blackburn, M.D. R. 254. She was treated by Dr. Blackburn for several years. Plaintiff complained of loss of feeling in the bottom of her feet, but without pain. *Id.* Dr. Blackburn thought this might be caused by tarsal syndrome involving both feet. *Id.* Dr. Blackburn noted that Plaintiff had some memory loss due to her three aneurysms. *Id.* Plaintiff said that "at times" she had headaches since her aneurysm surgery. R. 255. She also reported head, arm, and leg pain "attributed to fibromyalgia." *Id.* She reported fatigue, leg pain when she walks, trouble sleeping, and vision problems. *Id.* On examination, Plaintiff was alert, oriented, and on testing, her memory was basically intact. *Id.* Plaintiff's motor strength was essentially undiminished. *Id.* Finger to nose and heel-knee-shin coordination was good, and fine motor movement was also intact. *Id.* She had distal loss of pinprick

sensation in her feet to the ankle bilaterally, more profound at the bottom surface.  *Id.*

Mild Tinel's sign[7] over the right tarsal tunnel was also found.  *Id.*  Dr. Blackburn's

impression was peripheral polyneuropathy versus tarsal tunnel syndrome involving both

lower extremities.  *Id.*  He recommended NCV[8] testing "to see if she has either or both

conditions."  R. 256.

On September 30, 2002, Dr. Blackburn looked at the results of the NCV testing.

R. 253.  He determined that there was evidence of "definite right peroneal neuropathy

with absent distal potentials and a small abnormal appearing potential with stimulation

at the fibular head."  *Id.*  He thought that this was "compatible with an old injury she

describes with lower extremity fracture on that side" and he thought that Plaintiff had

injured that nerve in the past.  *Id.*  Otherwise, he said that the NCV testing in both lower

extremities was normal, and he said: "I do not see any evidence of polyneuropathy or

tarsal tunnel syndrome today."  *Id.*  Dr. Blackburn could not explain that sensation that

Plaintiff was having on the undersurface of her feet, and speculated that it could be mild

tarsal tunnel syndrome, but he could not "document" that with the NCV testing.  *Id.*

On October 23, 2007, Plaintiff told Dr. Blackburn that her symptoms of decreased

sensation over the bottom of both feet, some pain in the toes, and shooting sensations

in her feet seemed to be getting worse.  R. 260.  He noted that she was borderline for

having diabetes.  *Id.*  On examination, he found that Plaintiff had "good power in all

---

[7] Tinel's sign is:  "A tingling sensation in the distal end of a limb when percussion is made over the site of a divided nerve.  It indicates a partial lesion or the beginning regeneration of the nerve."  DORLAND'S MEDICAL DICTIONARY FOR HEALTHCARE CONSUMERS.

[8] Nerve conduction velocity testing.  DORLAND'S MEDICAL DICTIONARY FOR HEALTHCARE CONSUMERS.

limbs," but distal sensory loss to pinprick about her ankle level.  *Id.*  His diagnosis was

small fiber polyneuropathy "probably on the basis of early diabetes."  *Id.*  He added

Neurontin[9] to her medications.  *Id.*

On December 12, 2002, Plaintiff told Dr. Blackburn that the pain in her feet was

better.  R. 261.  She had, however, developed headaches that occurred a few times a

week.  *Id.*  They occurred when she stood up.  *Id.*  On examination, she had good

strength and normal sensation to light touch, pinprick, and temperature.  *Id.*  Her

coordination was good and her gait was unremarkable.  *Id.*  She was found to have

elevated hemoglobin A1C and had started taking Metformin.[10]  *Id.*  Dr. Blackburn's

diagnosis was diabetic polyneuropathy and facial migraines.  *Id.*  By January, 2003,

Plaintiff continued to have migraines and sharp pains in her toes, though her severe foot

pain was better, and Dr. Blackburn increased the level of Neurontin.  R. 262.  His

diagnosis was painful polyneuropathy and facial migraines.  *Id.*

---

[9] Neurontin has two uses.  First, it may be prescribed with other medications to treat partial seizures (the type in which symptoms are limited).  It can be used whether or not the seizures eventually become general and result in loss of consciousness.  Second, it can be used to relieve the burning nerve pain that sometimes persists for months or even years after an attack of shingles (herpes zoster).  PDRhealth™, PHYSICIANS' DESKTOP REFERENCE.

[10] Metformin is a hypoglycemic agent that potentiates the action of insulin; used in treatment of type 2 diabetes mellitus.  DORLAND'S MEDICAL DICTIONARY FOR HEALTHCARE CONSUMERS.

On April 29, 2003, Dr. Blackburn determined that Plaintiff had diabetes and hypertension. R. 263. He added Topamax,[11] thinking that it might help with the neuropathy and with the fibromyalgia as well. *Id.*

On May 21, 2003, Plaintiff had a CT scan of her cervical spine. R. 394. The impression was minimal spondylolisthesis of C4 and C5, minimal canal narrowing at C6-C7, foraminal narrowing on the left at C3-C4 and C5-C6, and foraminal narrowing on the right at C4-C5. *Id.*

On June 12, 2003, Plaintiff saw Dr. Blackburn again. R. 264. She had done extremely well with headaches since the end of April, when she started taking Topamax, and had had no severe migraines. *Id.* She "tolerated" Topamax well. *Id.* Plaintiff complained of pain in her feet. *Id.* She said that the bottom of her feet hurt when she walked. *Id.* On examination, Plaintiff had good strength in all limbs. *Id.* She had distal sensory loss in her fingertips and up to ankle level in the legs. *Id.* The impression continued to be "painful polyneuropathy and migraines." *Id.* Neurontin was increased. *Id.*

On September 4, 2003, Dr. Blackburn saw Plaintiff. R. 265. He noted that her painful polyneuropathy and headaches were doing "very well" following the increase of Neurontin in June and use of Topamax. *Id.* He noted that Plaintiff "overall is very happy with all of her pain control symptoms at this time." *Id.* Her primary physician had

---

[11] Topamax is an antiepileptic drug, prescribed to control both the mild attacks known as partial seizures and the severe tonic-clonic convulsions known as grand mal seizures. It is typically added to the treatment regimen when other drugs fail to fully control a patient's attacks. PDRhealth™, Physicians' Desktop Reference

decided to stop Elavil[12] as a sleep aid at night, so Dr. Blackburn increased Neurontin at night to 1600 mg. *Id.* On examination, Plaintiff had good sensation to light touch, temperature, and vibration distally in the feet. *Id.*

On December 4, 2003, Plaintiff returned to Dr. Blackburn. R. 266. Dr. Blackburn said that reduction of Plaintiff's noon dose of Neurontin had caused a "significant amount of increased pain in the evening." *Id.* Plaintiff had reduced her dosage of Elavil, but had had difficulty sleeping and had breakthrough symptoms and pain, so she was again taking 20 mg. of Elavil along with Topamax. *Id.* Plaintiff had not had a single severe headache. *Id.* He said: "She has had a little bit of foot discomfort and it is bothersome but tolerable. She denies severe pain." *Id.* The diagnosis was painful polyneuropathy, migraine headaches, and fibromyalgia, but doing well on the current regimen. *Id.*

On February 24, 2004, Plaintiff saw John Agens, M.D., a primary care physician. R. 337-338. She was treated by Dr. Agens for a number of years. She was then taking 18 different medications and had been diagnosed as having diabetes, diabetic neuropathy, neuropathic pain, migraine headaches, high blood pressure, and fibromyalgia. *Id.* She reported that she had had some memory impairment since having a brain aneurysm, but this was apparent only on "high-level psychological testing." *Id.* Dr. Agens explained:

> For example, she still manages her money and drives a car without difficulty. She still holds a job, but not at the same level she had before.

---

[12] Elavil is an antidepressant with sedative effects; the active ingredient is amitriptyline HCL. PHYSICIANS' DESK REFERENCE (2005). Amitriptyline hydrochloride is a tricyclic antidepressant having sedative effects; it is also used for treatment of chronic pain. DORLAND'S MEDICAL DICTIONARY FOR HEALTHCARE CONSUMERS.

> She is no longer a supervisor. . . . She does not feel that she can work a
> full eight-hour day. She is a microfilm technician.

R. 338. He noted that Plaintiff received corticosteroid and anesthetic injections in her

cervical spine due to neural foramen disease and spondylolisthesis as noted on a

cervical spine MRI on May 21, 2003. *Id.* He noted that she had good control of her

diabetes and blood pressure. *Id.* On review of systems, Dr. Agens noted that Plaintiff

was limited only a little in moderate activity ("such as moving a table, pushing a vacuum

cleaner, bowling, or playing golf"), and is "not limited at all when it comes to carrying

groceries; climbing one flight of stairs; bending, kneeling, or stooping; walking one

block; and bathing and dressing herself." *Id.* She noted no limitations of activities of

daily living at that time. *Id.* On examination, Dr. Agens found that Plaintiff had normal

strength and reflexes in her lower extremities. *Id.* He determined that cognitively,

Plaintiff seemed to be doing very well that day, and she did well on cognitive testing that

day by his nurse. R. 337. He referred her to a pain clinic for arthritis of her cervical

spine, and encouraged her to engage in physical activity. *Id.*

On March 1, 2004, Plaintiff saw Dr. Agens. R. 333. She reported worsening

neuropathic symptoms. *Id.* Plaintiff said she took Neurontin for neuropathic pain and

amitriptyline (Elavil, see note 11, supra) for fibromyalgia, but when she had tried to stop

taking amitriptyline, her neuropathy "got much worse." *Id.* Plaintiff said that her pain

varied from 4 to 10 on a scale of 10. *Id.*

On March 22, 2004, Plaintiff saw Dr. Blackburn again. R. 267. She reported

increased leg pain since her December visit. *Id.* She said that she had a new primary

physician, Dr. Agens. *Id.* Her foot pain had improved when Dr. Agens increased the

Neurontin level.  *Id*.  Plaintiff said she had some numbness of her left hand with increased sensitivity in the first two digits and some pain.  *Id*.  Dr. Blackburn found diminished sensation over the first through third digits of both hands.  *Id*.  Plaintiff was not numb to pinprick above mid-shin.  *Id*.  Some carpal tunnel syndrome on the left was noted, with mildly positive Tinel's sign.  *Id*.  Dr. Blackburn arranged for NCV testing on the left arm.  *Id*.  Plaintiff was wearing a wrist splint.  *Id*.  He agreed with the current medications for treatment of polyneuropathy.  *Id*.  On March 29, 2004, Dr. Blackburn found that the NCV testing showed very mild left carpal tunnel syndrome with involvement of one distal sensory segment only.  R. 268.

On April 1, 2004, Plaintiff saw Dr. Agens.  R. 330.  She had carpal tunnel symptoms of her left hand.  *Id*.

On October 19, 2004, Plaintiff returned to Dr. Blackburn with complaints of increased pain in her toes and some in her hands.  R. 269.  She was no longer experiencing carpal tunnel syndrome.  *Id*.  She noticed some loss of feeling in her feet and hands, and increased pain.  *Id*.  She was still taking Neurontin, Topamax, and Elavil.  *Id*.  Her headaches were still much better with Topamax.  *Id*.  On examination, Plaintiff had good power in all limb muscles, but had sensory loss to pinprick up to her mid-shin level on both sides and up to her palm on both sides.  *Id*.  Her coordination was good and her gait was stable.  *Id*.  Dr. Blackburn increased the dosage of Neurontin and planned to start Plaintiff on Cymbalta if she did not improve in two weeks.  *Id*.  He said that Cymbalta was a new drug approved for diabetic polyneuropathy.  *Id*.

On January 4, 2005, Plaintiff saw Dr. Agens.  R. 301.  She came in for "continuing care of chronic diabetes neuropathy pain."  *Id*.  Dr. Agens said that even

though Plaintiff's diabetes was "under good control, she still suffers with neuropathy and pain" and this was "giving her trouble walking long distances in parking lots." *Id.* Dr. Agens cautioned Plaintiff that having a disabled parking lot permit was not a reason to be less active, and he encouraged her to be more physically active. *Id.* He thought that she had less pain with Cymbalta. *Id.* Plaintiff was apparently still employed on this date according to her "social history." *Id.* On examination, it was determined that Plaintiff's feet had an absence of sensation and absent or weak pedal pulses. *Id.*

On January 5, 2005, Plaintiff against saw Dr. Blackburn. R. 270. She again reported increased pain since the October visit. *Id.* He lowered her dose of amitriptyline due to urinary incontinence. *Id.* He had started Plaintiff on Sanctura, a new medication for incontinence, and the problem seemed to have cleared up. *Id.* Plaintiff felt that the pain in her feet had improved. *Id.* The pain in her feet bothered her primarily with a spike of pain at night, and she said that she did "pretty well throughout the rest of the day." *Id.* Her migraine headaches were still doing well on Topamax. *Id.* On examination, Plaintiff continued to have good power in the limb muscles, but with sensory deficits up to her mid-shin level and some in her fingers. *Id.* She complained of pain when she walked barefoot, and walked with a slightly antalgic gait. *Id.* Her medications were continued. *Id.*

On March 17, 2005, Plaintiff returned to Dr. Agens. R. 296. She reported pain at a level of 6. *Id.* Plaintiff said that when her neuropathy was worse, "it makes her harder to get on at work, and she says this is the trigger for a lot of the issues that have led to her behavior at work." *Id.* Plaintiff asked Dr. Agens to fill out forms for the Florida Retirement System. *Id.* On examination, Plaintiff's ambulation and gait seemed normal.

*Id.* Dr. Agens's diagnosis was painful symptoms of peripheral neuropathy with only slight improvement from Cymbalta, diabetes, hypothyroidism, a history of degenerative disc disease in the cervical spine, a history of cerebral aneurysm, a history of carpal tunnel syndrom, well controlled hypertension, migraines, and fibromyalgia, among other illnesses. *Id.* Plaintiff reported that she was significantly less functional than she was a year earlier. *Id.*

On March 28, 2005, Plaintiff told Dr. Blackburn that her hands and feet were bothering her again, and she described a lot of pain in her hands and feet. R. 271. Dr. Blackburn found diminished sensation distally in Plaintiff's fingers and up to about mid-shin level in her lower extremity. *Id.* She had a positive Tinel's sign in the right extremity. *Id.* Apparently this was in the upper extremity as an NCV study for carpal tunnel syndrome was performed. *Id.* Dr. Blackburn found that Plaintiff's neuropathic pain was "still bothering her a great bit." *Id.* Plaintiff's medications were adjusted. *Id.* Plaintiff asked Dr. Blackburn to fill out a disability form for the Florida Retirement System. *Id.* He noted that her primary physician (Dr. Agens) had already done so. *Id.* The NCV study was normal, with no evidence of carpal tunnel syndrome. R. 272.

On April 21, 2005, Plaintiff spoke with Nurse Debra A. Dixon, apparently for Dr. Agens, asking for a disability evaluation for her diabetic neuropathy. R. 849. She was referred to Kirk Mauro, M.D. *Id.*

On May 3, 2005, Plaintiff was evaluated by Dr. Mauro, who specializes in medical rehabilitation. R. 1027. In a letter to Dr. Agens, Dr. Mauro noted that Plaintiff was currently employed, working for the clerk of court 37.5 hours per week as a microfilm technician. *Id.* Plaintiff reported to Dr. Mauro that she could do the work, but

had trouble getting along with other employees. *Id.* She was able to drive a motor vehicle. *Id.* Plaintiff's husband did most of the household chores as Plaintiff did not like to stand for prolonged periods of time. *Id.* Her extensive neuropsychological testing reports were not available to Dr. Mauro. *Id.* Plaintiff told Dr. Mauro that she can sit for one or two hours at work, and then must get up and walk but with walking, has increasing foot dysesthesia. *Id.* Plaintiff did not exercise, and she had difficulty going up and down steps. *Id.* The neurological examination results were essentially normal, and Plaintiff seemed to have fairly good recall as to prior events. *Id.* She was able to recall three out of three objects after one minute. *Id.* She knew the correct month, day, and year, could do arithmetic, and could discuss current events. *Id.* She had intact finger dexterity, and had functional range of motion of her cervical spine, shoulders, elbows, wrists, fingers, hips, knees, and ankles. *Id.* Her motor strength was diminished 4 out of 5. *Id.* Dr. Mauro said that his sensory examination results were consistent with diabetic peripheral polyneuropathy. *Id.* Plaintiff had difficulty tandem walking, but she had no paraspinal spasm and no SI joint tenderness. R. 1029. Her grip strength was intact and symmetrical. *Id.* Dr. Mauro determined that there was "no other clinical abnormality appreciated by physical assessment today." *Id.* His impression was: "Diabetes with diabetic neuropathy, previous aneurysms with post-operative hydrocephalus, requiring a shunt, in addition to migraines, chronic pain, fibromyalgia and possible social difficulties." *Id.* He determined that he could not say with any degree of medical certainty that she was disabled, and asked for additional documents. *Id.* He asked for documents from Dr. Blackburn, especially the EMG or nerve studies of her peripheral polyneuropathy, and her prior neuropsychological testing. *Id.* He also

asked for information from her employer as to difficulties at work and her mental capacity for social interaction and job performance. *Id.* Finally, he asked for Dr. Agens's opinion and substantiation of the information which Plaintiff provided concerning her extensive past medical history. *Id.* He noted that she was currently employed, but that doing the job was increasingly difficult. *Id.*

On May 16, 2005, Dr. Agens again saw Plaintiff. R. 294. Plaintiff said that sometimes her hands and feet swell and are painful, and he thought a lot of the pain was due to diabetic neuropathy. *Id.* Dr. Agens referred Plaintiff to Dr. Larry Kubiak for neuropsychological testing to see whether there was evidence of residual depression and to "look for any cognitive issues related to her cerebral aneurysm problem." *Id.* He tried to reduce Plaintiff's medications to help with hand and ankle swelling. R. 293. He continued Cymbalta for diabetic neuropathic pain. *Id.* Plaintiff was to have her annual cerebral angiogram at Shands. *Id.*

On June 8, 2005, Plaintiff was evaluated by Larry Kubiak, Ph.D. R. 1020. Dr. Kubiak said that he had tested Plaintiff earlier, in April, 2001, which resulted in a diagnosis of cognitive disorder, NOS. *Id.* He planned to test her to determine her present functioning. *Id.* She was still working as a microfilm technician. *Id.* Plaintiff told Dr. Kubiak that she had difficult concentrating, learning, remembering, and comprehending. *Id.* She was then on 21 different medications. *Id.* She said her current medical complaints were four aneurysms, brain injury, fibromyalgia, type II diabetes, painful diabetic polyneuropathy, arthritis in her neck, hyperthyroidism, migraines, high blood pressure, acid reflux, and bladder incontinence. *Id.*

Dr. Kubiak administered the Gordon Diagnostic System-Adult test to determine deficits in impulse control and attention. R. 1021. Dr. Kubiak determined from the vigilance test that Plaintiff had "significant deficits in sustained attention." *Id.* He detected a level of impulsivity somewhat greater than her peers, indicating a likelihood of disorganization. *Id.* In the distractability test (similar to the vigilance test, but more difficult), Dr. Kubiak found that Plaintiff had "significant deficits in sustained attention" and impulsivity. R. 1021-1022. He noted that contrary to the instructions, Plaintiff put up both hands to cover up the two outside columns but still performed extremely poorly. R. 1022. On another test, the Neurobehavioral Functioning Inventory, Plaintiff scored in the average range for memory and attention, but Dr. Kubiak commented that this score indicated that she would forget or miss appointments, would have poor concentration, and would be disorganized. *Id.*

The Delis-Kaplan Executive Functioning System tested higher level cognitive functions. R. 1023. The mean score was 10. *Id.* On the trail making test, Plaintiff scored below the mean (9) in visual scanning, (2) in number sequencing, (5) in letter sequencing, and (9) in motor speed. *Id.* She scored quite low (3) on letter fluency and (5) on category fluency. R. 1024.

Dr. Kubiak administered the Wechsler Memory Scale-3rd Edition to assess Plaintiff's memory function. *Id.* Plaintiff scored below the 50th percentile in auditory immediate and auditory delayed memory (47th and 42nd). *Id.* She scored in the 21st percentile in visual immediate memory and only 7th percentile in visual delayed memory. *Id.* She scored 32th percentile in immediate memory, and 37th percentile in delayed auditory recognition. *Id.* Her general working memory was in the 19th

percentile and her working memory was in the 32nd percentile.  R. 1025.  On the

orientation subtest of the Wechsler Memory Scale, Plaintiff did not know the President

who had preceded the then current President and did not know the date of the month or

day of the week.  *Id.*

Dr. Kubiak's diagnosis was cognitive disorder, NOS, rule out ADHD.  R. 1026.

He assigned a GAF score of 40.[13]  *Id.*  Dr. Kubiak recommended that Plaintiff use

"memory strategies" and that her medications be evaluated "as possibly contributing to

her cognitive deficits."  *Id.*  He said that Plaintiff was experiencing "difficulties in

orientation, sequencing, attention, verbal skills, [and] visual and general memory."  *Id.*

He recommended that Plaintiff's family assist her as much as possible.  *Id.*  He

recommended that Plaintiff engage in regular exercise to the extent that her physical

condition will allow, participate in family activities, maintain a daily routine, and use

clocks and calendars.  *Id.*  He recommended that Plaintiff have help in managing her

business affairs.  *Id.*

On June 13, 2005, Plaintiff returned to Dr. Blackburn.  R. 273.  Plaintiff's chief

complaint was neuropathic pain.  *Id.*  The increase of Topamax had not helped.  *Id.*  On

examination, Plaintiff continued to have "stocking" loss of sensation to mid-shin level

---

[13] Global Assessment of Functioning.  A GAF score of 31-40 indicates:

> Some impairment in reality testing or communication (e.g., speech is at
> times illogical, obscure, or irrelevant ) OR major impairment in several
> areas, such as work or school, family relations, judgment, thinking, or
> mood ( e.g., depressed man avoids friends, neglects family, and is unable
> to work; child frequently beats up younger children, is defiant at home, and
> is failing at school ).

*See* http://psyweb.com/Mdisord/DSM_IV/jsp/Axis_V.jsp.

and in the palm of her hand. *Id.* Her gait was slightly wide based, and her hand

coordination was good. *Id.* Her migraines were "doing great." *Id.*

On June 16, 2005, Dr. Agens noted that Dr. Blackburn had said that Plaintiff's

diabetic neuropathy would probably never get better, and he agreed. R. 291. Plaintiff

had a growth on her foot, and he said that given her condition, "foot care is paramount."

*Id.* He noted that Plaintiff was taking Nexium for increased reflux symptoms. *Id.* She

was referred for a gastroenterology workup. *Id.* Dr. Agens said that Plaintiff "has a

stressful prognosis of her diabetic neuropathy which is poor." *Id.* He felt that Plaintiff

needed to get "on with her life not trying to fix the diabetic neuropathy because I believe

she has got the most improvement that she is going to get." *Id.*

On June 30, 2005, Plaintiff underwent a cerebral angioplasty. R. 1014. Her

aneurysms were stable. R. 1013.

On September 12, 2005, Plaintiff saw Dr. Agens. R. 287. She was worried

about three small ulcerations on her foot. *Id.* Her diabetes was under "perfect" control.

*Id.* Her pain from fibromyalgia and other illnesses was "much better on Cymbalta." *Id.*

She had arthritic neck pain. *Id.* She had reduced sensation in her lower extremities. R.

286.

On October 4, 2005, Plaintiff returned to Dr. Blackburn. R. 252. Plaintiff's

neuropathic pain was primarily in her legs. *Id.* The pain had been tolerable recently,

and she said that she could "live with it." *Id.* Dr. Blackburn found that Plaintiff had

sensory loss almost to her knees and to the base of her hand in her upper extremities.

*Id.* Her gait was wide based, and somewhat stiff-legged. *Id.*

There is a note by J. Daniel Davis, M.D., dated October 27, 2005, that Plaintiff had a sleep study showing mild to moderate sleep apnea. R. 275. She was prescribed CPAP,[14] and this had helped. *Id.* She had a decreased need for afternoon naps and had increased energy. *Id.*

On December 20, 2005, Plaintiff was to see Dr. Blackburn. R. 799. It was noted that she was no longer working, and was on "critical leave" until March, 2006. *Id.* She had applied for disability benefits. *Id.*

On February 9, 2006, Plaintiff was examined by May Tay, Ph.D. R. 396. She had been referred by the state agency for a Wechsler Memory Scale test. *Id.* Dr. Tay determined that Plaintiff made a good effort on the test. *Id.* She found her to be oriented in all relevant spheres, and she was cooperative. *Id.* Dr. Tay found that Plaintiff's working memory was in the 16th percentile. R. 397. Dr. Tay found her delayed auditory recognition was in the 25th percentile. *Id.* Plaintiff's scores for auditory immediate memory, visual immediate memory, auditory delayed memory, visual delayed memory, and general memory ranged from the 42nd to the 73rd percentile, with working memory at the 45th percentile. *Id.* Dr. Tay concluded that with the exception of Plaintiff's working memory, which was in the low average at the 16th percentile, her scores were all within the average range. *Id.*

---

[14] People with obstructive sleep apnea, particularly those who have excessive daytime sleepiness, benefit most predictably from continuous positive airway pressure (CPAP). With a CPAP device, people breathe through a face or nose mask that provides a slightly higher pressure in the airway. This increased pressure props the throat open as the person breathes in. CPAP can be given with or without humidifying the delivered air. DORLAND'S MEDICAL DICTIONARY FOR HEALTHCARE CONSUMERS.

On February 15, 2006, relying upon this study, Plaintiff's past work, lack of mental health treatment, and Plaintiff's activities of daily living, a non-examining state psychologist determined that Plaintiff had no medically determinable mental impairment. R. 399-411.  On February 27, 2006, a non-examining physician determined that Plaintiff could do light work with postural limitations.  R. 413-420.

On March 1, 2006, Plaintiff told Dr. Blackburn that she awoke one night with severe foot pain, but overall had been doing better.  R. 906.  She had started taking Lyrica[15] since her last visit.  *Id.*  Lyrica helped her pain "somewhat," and Plaintiff was able to reduce her dosage of Neurontin.  *Id.*  Plaintiff continued to have neuropathy in her lower extremities to the upper shin level.  *Id.*

On April 4, 2006, Plaintiff had a debilitating headache.  R. 772.  She was referred to the emergency room.  R. 770.  On April 20, 2006, Plaintiff saw Dr. Agens.  R. 762. She was taking 26 medications.  R. 765.

On June 15, 2006, Dr. Mauro filled out a regular disability physician's report for the Florida Retirement System.  R. 434.  Dr. Mauro said that Plaintiff's primary disabling condition were cognitive deficits as a result of (status post) aneurysm repair.  R. 435. He said that her secondary disabling conditions were diabetes, neuropathy, migraines, and fibromyalgia.  *Id.*  He said that Plaintiff's condition had stabilized, and that Plaintiff was not a candidate for vocational rehabilitation.  *Id.*  To explain how he reached these conclusions, Dr. Mauro commented: "see neuropsych testing of Dr. Kubiak and CHP

---

[15] Lyrica is used in patients 18 years of age and older with nerve pain called diabetic neuropathy, postherpetic infection nerve pain, fibromyalgia (a condition in which there is widespread pain in the muscles and soft tissues surrounding the joints throughout the body), and in combination with other medications to reduce the incidence of seizures. PDRhealth™, PHYSICIANS' DESKTOP REFERENCE.

[Capital Health Plan] – records." *Id.* Dr. Mauro concluded that Plaintiff had a severe limitation of cognitive functional capacity, that she was permanently incapable of any kind of work, and was totally and permanently disabled from gainful employment. *Id.*

On June 27, 2006, Plaintiff saw Dr. Blackburn. R. 986. Plaintiff reported that she was having "a lot more pain in her hands and feet." *Id.* The increased dose of Cymbalta had helped, but she said that her pain was "just getting worse over time." *Id.* Dr. Blackburn thought that this contradicted her report on the previous visit and he told her it did not make sense. *Id.* Plaintiff explained that her pain was worse first thing in the morning, and wakes her up at 5 or 6 a.m. *Id.* Plaintiff continued to have sensory loss to mid-calf and up to the base of her palm in both hands. *Id.* Dr. Blackburn's impression was "painful polyneuropathy and migraine headaches with probably some component of fibromyalgia as well." *Id.* He modified her medications. *Id.*

Dr. Agens saw Plaintiff again on July 11, 2006. R. 736. Plaintiff could not feel her fingers or her toes. *Id.* Dr. Agens determined that Plaintiff's peripheral neuropathy was severe. R. 738.

On September 27, 2006, Plaintiff fell in the bathroom and reported that, as a consequence, she had severe pain from her pelvis to her rib cage. R. 722. Dr. Blackburn determined on October 16, 2006, that Plaintiff had degenerative arthritis in the neck by bone scan and an x-ray showed some subacute fractures of the transverse process of several lumbar vertebrae. R. 704. He thought that this likely accounted for her pain. *Id.* Her pelvis and ribs were normal. *Id.*

On October 24, 2006, Dr. Blackburn noted that Plaintiff had completely discontinued Neurontin. R. 983. She remained on Lyrica, Topamax, and Cymbalta. *Id.*

Her neuropathic pain was much better overall.  *Id.*  She was to return to Shands for another aneurysm clipping in November.  *Id.*  She still had significant loss of sensation in her lower extremities and hands to her wrists and forearms.  *Id.*

On October 27, 2006, a CT scan of Plaintiff's brain revealed encephalomalacia[16] of her left frontal lobe.  R. 1102.  This had previously been seen on a CT scan on April 5, 2008.  *Id.*  Another brain CT scan was performed on January 16, 2007.  R. 1095.  This revealed an "old area of encephalomalacia" in "the left anterior frontal lobe."  *Id.*  The scan further revealed "mild cerebral atrophy in the anterior frontal regions, left greater than right."  *Id.*  All of this was found to be without significant change since a CT scan on July 7, 2006.  *Id.*

On January 16, 2007, Plaintiff returned to Dr. Agens.  R. 645.  Her sensory examination continued to be abnormal.  R. 647.  She still had no feeling in the soles of her feet.  R. 648.  She was still taking 23 medications.  *Id.*

On February 13, 2007, Plaintiff saw Dr. Blackburn again for painful polyneuropathy, migraines, and fibromyalgia.  R. 475.  Plaintiff said that the pain in her knees and feet had gotten worse.  *Id.*  She had had surgery for an aneurysm at Shands and had postoperative complications of plate failure from a previous plate and shunt infection.  *Id.*  Those problems were corrected and she had had plastic surgery, for a total of three recent surgeries.  *Id.*  She had a healing craniotomy scar on the right.  *Id.*  She had again been experiencing headaches and vertigo after the surgeries.  *Id.*  Dr. Blackburn again prescribed Topamax, hoping that it would help with the headaches and

---

[16] Encephalomalacia is a softening of the brain.  DORLAND'S MEDICAL DICTIONARY FOR HEALTHCARE CONSUMERS.

vertigo. *Id.* Dr. Blackburn said he did not have much else to help with Plaintiff's pain,
noting that while she complained of that pain on each visit, the symptoms fluctuated,
and he thought that she needed to be referred to "pain management." *Id.*

On April 5, 2007, Plaintiff was seen again by Dr. Agens. R. 618. She
complained of loss of memory, with onset about five years earlier after her second
aneurysm, but not worse since her last surgery. *Id.* She said that she could drive a
motor vehicle and pay her bills "ok." *Id.* She had complete loss of sensation from her
mid-calf down her leg. R. 619.

On May 14, 2007, Plaintiff saw Dr. Blackburn. R. 474. Her headaches had
improved with Topamax. *Id.* Her neuropathy of feet and hands was the same. *Id.*
Plaintiff had good motor power, diminished sensation, and good coordination. *Id.* He
thought she was doing well on her current medications. *Id.*

On June 28, 2007, Dr. Agens saw Plaintiff. R. 603. She had just returned from a
month in England. *Id.* She said that several fingers on each hand had been
intermittently painful at a moderate level. *Id.* Some digital edema was noted. *Id.*
Plaintiff reported that she exercised by walking. *Id.* She said that her pain level was 8
early in the day and then 4 later in the day. *Id.*

On September 13, 2007, Dr. Blackburn found Plaintiff's conditions to be stable.
R. 473. She mentioned a "bit of imbalance." *Id.* Her sensory loss in her legs was
slightly above mid-shin. *Id.* On September 28, 2007, Plaintiff reported to Dr. Agens that
she had burning in her extremities, and numbness and tingling in her hands and feet.

On October 25, 2007, Dr. Agens filled out a regular disability report for the
Florida Retirement System, the same form that Dr. Mauro had used. R. 460. He said

that he had been treating Plaintiff since February, 2004.  R. 461.  Dr. Agens said that

Plaintiff's primary disabling condition was cognitive deficits resulting from brain

aneurysms and surgeries.  *Id.*  He said that her secondary disabling conditions were

diabetic neurological damage, fibromyalgia, migraine headaches, urinary incontinence,

and sleep apnea.  *Id.*  He thought that Plaintiff's cognitive deficits would persist.  *Id.*  He

determined that Plaintiff had severe limitation of functional capacity due to her cognitive

and neurological deficits.  *Id.*  Dr. Agens relied upon the evaluation by Dr. Kubiak.  *Id.*

On January 30, 2008, William L. Morse, M.D., also filled out the Florida

Retirement System disability report.  R. 462.  Dr. Morse said he first treated Plaintiff on

March 21, 2003.  R. 463.  Like Drs. Mauro and Agens, he thought that Plaintiff was

severely limited in functional capacity due to her cognitive disorder and diabetic

neuropathy.  *Id.*  He said he had not placed Plaintiff on restrictions of activities, but he

thought she was unable to remember well enough to keep a job, and she drops things.

*Id.*  He said that Plaintiff was not a candidate for vocational rehabilitation.  *Id.*  Dr. Morse

said he relied in part upon the evaluation done by Dr. Kubiak in April, 2001, the earlier

evaluation.  R. 464.

On February 19, 2008, Plaintiff saw Dr. Blackburn.  R. 472.  Plaintiff still had foot

pain, but her headaches were doing well overall.  *Id.*  She had been experiencing leg

cramps and had felt a bit ataxic.[17]  *Id.*  He planned to send Plaintiff to physical therapy

for anodyne laser treatment of her feet and evaluation and treatment of ataxia.  *Id.*

---

[17] Ataxia is a failure of muscular coordination; irregularity of muscular action. DORLAND'S MEDICAL DICTIONARY FOR HEALTHCARE CONSUMERS.

On August 6, 2008, Plaintiff told Dr. Blackburn that she had "a lot of pain in the feet," but her headaches had improved. R. 471. Magnesium had helped with leg cramps. *Id.* Dr. Blackburn noted that Plaintiff had been sent in March for physical therapy for gait and balance. *Id.* Plaintiff continued to have the same loss of sensation. *Id.* Her reflexes in her arms and ankles were "trace to absent." *Id.* Her gait was "minimally wide based and somewhat stiff-legged." *Id.* He adjusted her medications and planned again to initiate physical therapy for her gait and balance. *Id.*

On December 9, 2008, Plaintiff was seen by Dr. Agens. R. 481. He said Plaintiff's diabetic neuropathy was moderate in severity. *Id.* He said she had constant pain in her legs and arms bilaterally, and that these symptoms (pain) were aggravated by use. *Id.* He said her diabetic neuropathy was relieved with medication (Lyrica) and rest. *Id.* He said that her associated symptoms were motor weakness, restlessness, and tingling. *Id.* He said that Plaintiff was anxious, and had mildly impaired short term memory. R. 482.

On January 28, 2009, Plaintiff was seen by Robert Chapman, M.D., for a severe headache and nausea. R. 1189. He thought that her headache was another form of migraine and prescribed an increase of Percocet.[18] *Id.* Plaintiff said that her headache occurred constantly, that the location was her entire head, and had not changed. *Id.* She had had a negative CT scan the day before. *Id.* She was in moderate distress. R. 1190.

---

[18] Percocet, a narcotic analgesic, is used to treat moderate to moderately severe pain. It contains two drugs – acetaminophen and oxycodone. Acetaminophen is used to reduce both pain and fever. Oxycodone, a narcotic analgesic, is used for its calming effect and for pain. PDRhealth™, PHYSICIANS' DESKTOP REFERENCE.

On February 10, 2009, Plaintiff returned to Dr. Blackburn. R. 1216. He noted that physical therapy had helped some with her balance, but she still felt imbalanced. *Id.* She reported that she had had a bad headache the month before, and had bilateral occipital nerve blocks at Shands when she had her annual CT angiogram for aneurysms. *Id.* She had not had a headache since then. *Id.* Dr. Blackburn said that overall, her fibromyalgia and polyneuropathy were doing well. *Id.* She had loss of sensation just below the knee. *Id.* His diagnosis was painful polyneuropathy, migraine headaches, fibromyalgia, chronic ataxia, and a history of aneurysms. *Id.*

**Legal analysis**

> **Whether the ALJ erred in rejecting the opinions of treating physicians, Dr. Agens, and consultative physician, Dr. Mauro, and whether the ALJ erred in failing to discuss the evaluation by Dr. Kubiak and the evidence from Plaintiff's supervisor at work**

These several contentions are related and, like Defendant, should be discussed together. The opinion of a claimant's treating physician, Dr. Agens, must be accorded considerable weight by the Commissioner unless good cause is shown to the contrary. Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997). The reasons for giving little weight to the opinion of a treating physician must be supported by substantial evidence, Marbury v. Sullivan, 957 F.2d 837, 841 (11th Cir. 1992), and must be clearly articulated. Phillips v. Barnhart, 357 F.3d 1232, 1241 (11th Cir. 2004).

A consultative examination, that is, a one-time examination by a physician like Dr. Mauro who is not a treating physician, need not be given deference by the Commissioner. McSwain v. Bowen, 814 F.2d 617, 619 (11th Cir. 1987); Kirby v. Astrue, 500 F.3d 705, 709 (8th Cir. 2007) (a consulting physician's opinion "deserves no special

weight").  The opinion of a consultative physician, however, is still a medical opinion deserving of consideration along with all of the other evidence.  If the opinion of a consulting physician is consistent with other medical evidence, it is entitled to great weight.  Moncrief v. Astrue, 300 Fed.Appx. 879, 881 (11th Cir. Dec 1, 2008) (not selected for publication in the Federal Reporter, No. 08-12853) (citing  20 C.F.R. § 404.1527(f)(2)(i)).

The Administrative Law Judge rejected, reasoning that Dr. Mauro's evaluation because Dr. Mauro only examined Plaintiff once, in May, 2005, and "this examination highlighted only slight limitations."  R. 18.  It is true that the May, 2005, examination revealed only mild limitations.  Dr. Mauro said that the neurological examination results were essentially normal, and Plaintiff seemed to have fairly good recall.  R. 1027.  But Dr. Mauro also said that his sensory examination was consistent with diabetic peripheral polyneuropathy.  _Id._  Dr. Mauro's impression was:  "Diabetes with diabetic neuropathy, previous aneurysms with post-operative hydrocephalus, requiring a shunt, in addition to migraines, chronic pain, fibromyalgia and possible social difficulties."  R. 1029.  Dr. Mauro concluded that he could not say with any degree of medical certainty that Plaintiff was disabled, and asked for additional documents.  _Id._  He asked for documents from Dr. Blackburn, especially the EMG or nerve studies of her peripheral polyneuropathy, and her prior neuropsychological testing.  _Id._  He also asked for information from her employer as to difficulties at work and her mental capacity for social interaction and job performance.  _Id._  In other words, Dr. Mauro himself did not think his physical examination of Plaintiff was an adequate basis to form a conclusion about Plaintiff's abilities.

The ALJ then rejected Dr. Mauro's opinion because Dr. Mauro initially said he could not state with any degree of medical certainty that claimant was disabled. R. 18. This is not an adequate reason to reject Dr. Mauro's opinion. After all, Dr. Mauro did not have all of the medical records and he reserved judgment. Defendant now argues that there is nothing in the record to show that Dr. Mauro received those records, doc. 28, p. 12, but that is not true. When Dr. Mauro reached his final conclusion, he commented that he had reviewed Dr. Kubiak's neuropsychological testing of Plaintiff and all of the medical records from Capital Health Plan, which would have included all of Plaintiff's medical records from Drs. Agens and Chapman. R. 435, 15.

The final reason given by the ALJ for rejecting Dr. Mauro's opinion was the ALJ's finding that Plaintiff "testified to daily activities compatible with work activity." R. 18. The ALJ had previously described Plaintiff's testimonial description of her daily activities. R. 16. There she found that Plaintiff said that she dressed herself in the morning and then left the house so that her husband could sleep. *Id.* She went to a fast food restaurant for daily breakfast and took her medications. *Id.* She said that she read a book in the morning, but had to read the same passage 20 times and still could not remember what she read. *Id.* She used "sticky" notes to remind herself to do things. *Id.* She organized her medications every other day. *Id.* She said that if she had to learn something new, she had to practice. *Id.* Earlier, the ALJ had mentioned evidence that Plaintiff attended church and was involved in a women's organization at church. R. 17. All of these findings are supported by Plaintiff's testimony, but this simply shows that Plaintiff has an ability to drive herself to a store, to order something, to pay for it, to attend church once a week, and to participate in a church organization.

There is no evidence as to Plaintiff's specific activities in the women's organization. This is not substantial evidence of an ability to do light work, 8 hours a day, 40 hours a week, and to concentrate, persist, and keep pace with such work. It is not evidence that Plaintiff can do a good deal of walking or standing, given the painful neuropathy she suffers in her feet, or that she can frequently grasp and carry up to 10 pounds, given the painful neuropathy in her hands.[19] Evidence of an ability to do a few daily activities is often weak evidence of an ability to work in a competitive work environment.[20] Finally, the evidence concerning Plaintiff's ability to remember what she has read runs directly counter to a rejection of Dr. Mauro's opinion.

The ALJ also rejected the opinion of Dr. Mauro, finding that he did not give an opinion as to Plaintiff's functional limitations, and instead, expressed an opinion as to whether Plaintiff could do work, a question reserved to the Commissioner. R. 18-19. This is not supported by the record. Dr. Mauro identified a number of disabling

---

[19] Light work requires an ability to frequently lift and carry 10 pounds and to do a "good deal of walking or standing." 20 C.F.R. §§ 404.1567(b) and 416.967(b).

[20] Ross v. Apfel, 218 F.3d 844, 849 (8th Cir. 2000) ("The ability to perform sporadic light activities does not mean that the claimant is able to perform full time competitive work."); Foote v. Chater, 67 F.3d 1553, 1561 (11th Cir. 1995) (the court must consider the entire record when determining whether the evidence of a claimant's daily activities is substantial evidence for the conclusion that she retains the residual functional capacity to work); Lewis v. Callahan, 125 F.3d 1436, 1441 (11th Cir. 1997) ("Nor do we believe that participation in everyday activities of short duration, such as housework or fishing, disqualifies a claimant from disability or is inconsistent with the limitations recommended by Lewis's treating physicians."); Parker v. Bowen, 793 F.2d 1177, 1180 (11th Cir. 1986) (when considering daily activities, the entire record must be considered, including the claimant's testimony that she had to lie down after two hours of such work); Foote v. Chater, 67 F.3d 1553, 1561 (11th Cir. 1995) (a conclusory citation to a claimant's "daily activities" as a basis for failing to believe her testimony as to pain was insufficient where there was a medical condition that reasonably could have given rise to the pain described, and, although she testified that she cooked and shopped for herself, she had trouble putting on her clothing).

conditions (aneurysm repair with cognitive deficits, diabetes, neuropathy, migraines, and fibromyalgia), and then he said that Plaintiff has a severe limitation of cognitive functional capacity. R. 435. Likewise, that Dr. Mauro thought that Plaintiff was "permanently incapable of any kind of work," the ultimate issue, does not mean that the ALJ may ignore this opinion. Of course, the Administrative Law Judge decides this issue based upon the evidence in the record, but that does not mean that Dr. Mauro's opinion was devoid of probative value. Dr. Mauro's expertise is in "medical rehabilitation." R. 1027. One who is an expert in rehabilitation is most likely an expert in the functional skills needed to do work. Experts routinely and properly express opinions touching upon ultimate issues. *Cf.*, Federal Rule of Evidence 704(a). The ALJ should discuss and evaluate the opinion in light of all of the evidence, not discard it because the expert has tread upon the ultimate issue reserved to the Commissioner. In summary, the reasons given for rejecting Dr. Mauro's opinion are not supported by substantial evidence in the record.

The Administrative Law Judge rejected the opinion of treating physician Dr. Agens in part because she found his opinion to be inconsistent with his treatment notes, "which do not document the level of severity expected of an individual incapable of performing any work tasks, and with the evidence of record when considered in its entirety." R. 18. The ALJ had earlier noted that Dr. Agens had diagnosed Plaintiff as having "menopausal symptoms, diabetic neuropathy, peripheral neuropathy, hypertension, asthma, hypothyroidism, fibromyalgia, migraine, degenerative joint disease of the cervical spine, cerebral aneurysm, incontinence, and ear problems." R.

15.  These diagnoses do not contradict his opinion.  The ALJ did not further identify the specific aspects of the treatment notes of Dr. Agens that contradicted his opinion.

Defendant now attempts to remedy this with argument before this court.  Doc. 28, pp. 13-14 (discussing specific findings in the treatment notes of Dr. Agens).  On administrative review of an action of an agency of the Executive Branch, this court may not "substitute counsel's *post hoc* rationale for the reasoning supplied by the" agency itself.  N.L.R.B. v. Kentucky River Community Care, Inc., 532 U.S. 706, 715 n.1, 121 S.Ct. 1861, 1868 n.1, 149 L.Ed.2d 939 (2001), *quoting*, N.L.R.B. v. Yeshiva Univ., 444 U.S. 672, 685, n. 22, 100 S.Ct. 856, 63 L.Ed.2d 115 (1980) (citing Securities and Exchange Commission v. Chenery Corp., 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947)[21]); Real v. Simon, 514 F.2d 738, 739 (5th Cir. 1975) (denying rehearing of Real v. Simon, 510 F.2d 557 (5th Cir. 1975)); Golembiewski v. Barnhart, 322 F.3d 912, 916 (7th Cir. 2003); Fargnoli v. Massanari, 247 F.3d 34, 44 n. 7 (3d Cir. 2001).  However,

> While we may not supply a reasoned basis for the agency's action that the agency itself has not given [citing Chenery Corp.], we will uphold a

---

[21] Chenery Corp. held:

> When the case was first here, we emphasized a simple but fundamental rule of administrative law.  That rule is to the effect that a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency.  If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis.  To do so would propel the court into the domain which Congress has set aside exclusively for the administrative agency.

Chenery Corp., 332 U.S. at 196, 67 S.Ct. at 1577.

decision of less than ideal clarity if the agency's path may reasonably be discerned.

Manasota-88, Inc. v. Thomas, 799 F.2d 687, 691 (11th Cir. 1986).

The ALJ's reasoning cannot be reasonably discerned here, and my own review of the medical records set forth above does not point the way either. From all that I can tell, Dr. Agens repeatedly found that Plaintiff suffered from painful neuropathy, a condition that was not expected to improve. Dr. Agens was also concerned about Plaintiff's possible cognitive deficits. When Dr. Agens saw Plaintiff on February 24, 2004, Dr. Agens said that Plaintiff's daily activities were only moderately limited. R. 337-338. A week later, Plaintiff's neuropathic pain was much worse, 6 on a scale of 10. R. 333. On January 4, 2005, Dr. Agens noted that Plaintiff "still suffer[ed] with neuropathy and pain" and this was "giving her trouble walking long distances in parking lots." R. 301. On March 17, 2005, Plaintiff again reported pain at level 6 and Dr. Agens's diagnosis was painful symptoms of peripheral neuropathy with only slight improvement from Cymbalta. R. 296. On May 16, 2005, Dr. Agens was concerned with whether Plaintiff had cognitive damage from the several brain aneurysms she had suffered and referred her to Dr. Kubiak. R. 294. On June 16, 2005, Dr. Agens said that Plaintiff's diabetic neuropathy would probably never get better. R. 291. He also said that Plaintiff "has a stressful prognosis of her diabetic neuropathy which is poor" and said she must "get on with her life" because her disability would not improve. Id. On July 11, 2006, Dr. Agens said that Plaintiff could not feel her fingers or her toes, R. 736, a condition of some concern for someone who is supposed to be able to frequently lift and carry objects weighing up to 10 pounds, and he determined that Plaintiff's

peripheral neuropathy was severe. R. 738. On December 9, 2008, Dr. Agens said Plaintiff's diabetic neuropathy was moderate in severity, but she had constant pain in her legs and arms bilaterally and these symptoms (pain) were aggravated by use. R. 481.

It would seem that the ALJ rejected the opinions of Drs. Mauro and Agens largely based upon a perception of the extent of Plaintiff's daily activities, which she discussed several times (R. 16, 17, 18), and her observation that Plaintiff did not seem to be in pain during the hearing. R. 18. That Plaintiff did not experience pain during the short hearing is compatible with the treatment notes discussed at length above. There were some occasions when Plaintiff's medications were working fairly well and the pain she was experiencing was manageable. But Plaintiff's treating physicians, Drs. Agens and Blackburn, repeatedly said she had painful polyneuropathy. Thus, the ALJ's observation of Plaintiff at the hearing was not substantial evidence to discount the opinion of Drs. Agens and Mauro. It is not appropriate for the Administrative Law Judge, who is not a medical expert, subjectively to arrive at an index of traits which she expects the claimant to manifest at the hearing, and then to deny the claim when such traits are not observed. Freeman v. Schweiker, 681 F.2d 727, 731 (11th Cir. 1982).[22]

---

[22] The Eleventh Circuit has termed this "sit and squirm jurisprudence," and forbids that this method of analysis be used. McRoberts v. Bowen, 841 F.2d 1077, 1081 (11th Cir. 1988); Johns v. Bowen, 821 F.2d 551, 557 (11th Cir. 1987); Wilson v. Heckler, 734 F.2d 513, 517 (11th Cir. 1984). It is proper, however, for the ALJ to consider the claimant's demeanor and appearance during the hearing as long as this is not in lieu of consideration of the medical evidence presented. Norris v. Heckler, 760 F.2d 1154, 1158 (11th Cir. 1985); Macia v. Bowen, 829 F.2d 1009, 1011 (11th Cir. 1987). "We do not accept an ALJ's mere reliance on his observation of a claimant during a hearing as the only basis upon which to reject a claimant's reference to pain." Norris, 760 F.2d at 1158.

The ALJ further rejected the opinion of Dr. Agens because Plaintiff "has testified to daily activities compatible with work activity." This reason is flawed for the reasons discussed above.

Finally, like the opinion of Dr. Mauro, the ALJ determined that Dr. Agens's opinion was not worthy of substantial weight because he did not articulate specific functional limitations. R. 18. Treating physicians observe and note symptoms and establish treatment plans; they usually do not note functional limitations unless to advise an employer as to a patient's ability to return to work. Further, as was true about Dr. Mauro, the form that Dr. Agens completed plainly spoke about functional limitations. Dr. Agens said that Plaintiff had cognitive deficits resulting from brain aneurysms and surgeries (a functional limitation), and said that she had several other disabling conditions: diabetic neurological damage, fibromyalgia, migraine headaches, urinary incontinence, and sleep apnea. R. 461. Dr. Agens concluded that Plaintiff had severe limitation of functional capacity due to her cognitive and neurological deficits, and that these would persist. *Id.* Thus, the conclusion that the opinion of Dr. Agens was not entitled to substantial weight for lack of any reference to functional limitations is not supported by substantial evidence in the record.

In addition to these problems, the ALJ did not mention Dr. Kubiak's neuropsychological evaluation. The ALJ only said that "psychological testing has revealed that the claimant has suffered only minor memory loss." R. 17. Dr. Kubiak did not discuss in detail the meaning of Plaintiff's scores on the several tests, but the pattern was usually below average and sometimes in a very low range. The scores were not substantial evidence for the conclusion that Plaintiff has suffered only "minor"

memory loss.  For example, from the Gordon Diagnostic System-Adult test, Dr. Kubiak

determined that  Plaintiff had "*significant* deficits in sustained attention."  R. 1021

(emphasis added).  In the distractability test (similar to the vigilance test, but more

difficult), Dr. Kubiak found that Plaintiff had "*significant* deficits in sustained attention"

and impulsivity.  R. 1021-1022 (emphasis added).  On the Delis-Kaplan Executive

Functioning System test, where the mean score was 10, Plaintiff scored 2 on number

sequencing, 3 on letter fluency, and only 5 on letter sequencing and category fluency.

R. 1023-1024.  These also are significant deficits, and more than mild impairments.  On

the Wechsler Memory Scale-3rd Edition to assess Plaintiff's memory function Plaintiff

scored only 7th percentile in visual delayed memory.  R. 1024.  Dr. Kubiak's diagnosis

was cognitive disorder, NOS, rule out ADHD.  R. 1026.  He assigned a GAF score of

40, which indicates, *inter alia*, "major" impairment in thinking.  *Id.* and footnote 12,

*supra*.  Dr. Kubiak concluded that Plaintiff was experiencing "difficulties in orientation,

sequencing, attention, verbal skills, [and] visual and general memory."  *Id*.  He

recommended that Plaintiff's family assist her as much as possible and that she have

help in managing her business affairs.  *Id*.

Dr. Mauro and Dr. Agens both relied significantly upon the test results from Dr.

Kubiak, so the failure to discuss Dr. Kubiak's evaluation was another aspect of the

failure to properly evaluate the opinions of Dr. Mauro and Dr. Agens.  Dr. Mauro

specializes in medical rehabilitation and he had the expertise to discern the extent of

Plaintiff's mental functional limitations from Dr. Kubiak's testing and comments.

Although the Dr. Agens's speciality did not particularly include organic brain injuries, he

treated Plaintiff over a long period of time and he is a physician.  Dr. Mauro concluded

that Plaintiff has a *severe* limitation of cognitive functional capacity.  R. 435.  Dr. Agens

likewise concluded that Plaintiff had a *severe* limitation of functional capacity due to her

cognitive and neurological deficits.  R. 461.  Consequently, the ALJ's conclusion that

Plaintiff has only mild memory deficits lacks the support of substantial evidence in the

record.[23]

Finally, Dr. Mauro specifically asked that evidence be gathered from Plaintiff's

former employer to see whether Plaintiff manifested symptoms of memory impairment

while at work.  That evidence was gathered.  In January, 2006, Brian Murphy said that

Ms. Lightfoot (Plaintiff's former supervisor, whom Murphy himself supervised) related

that Plaintiff "no longer was able to perform at a normal pace due to inability to recall

information or retain new information readily."  R. 155.  She said that Plaintiff's "memory

problems were a significant impairment to her being able to perform her job any longer."

*Id.*  Ms. Lightfoot's evidence could have been provided to Dr. Mauro before Dr. Mauro

rendered his June, 2006, opinion.  Had this evidence been provided to Dr. Mauro,

however, it would only have confirmed his opinion.  The ALJ did not discuss Ms.

Lightfoot's evidence.  Nor did the ALJ mention that an interviewer for the Social Security

Administration noted on November 7, 2005, that Plaintiff's appearance and behavior

---

[23] Apparently Dr. Mauro did not have Dr. Tay's psychological test results.  Dr. Tay's test results revealed somewhat less memory impairment than the results shown by Dr. Kubiak's testing, but on some tests the results were much the same.  Dr. Tay conducted only one test, while Dr. Kubiak conducted a broad range.  Dr. Mauro found Dr. Kubiak's results to be sufficient for his opinion, and so did Dr. Agens.  Given the other problems noted herein, and the opinions of Drs. Mauro and Agens, there is no cause to remand to ask for the differences between Dr. Kubiak and Dr. Tay to be resolved.

was remarkable for a lack of memory, and that Plaintiff had problems with talking, answering, coherency, and concentration.  R. 133.

The result of this analysis is dictated by well-established law.  "Where the Secretary has ignored *or* failed properly to refute a treating physician's testimony, we hold as a matter of law that he has accepted it as true." *Id.* (emphasis added); Elam v. Railroad Retirement Bd., 921 F.2d 1210, 1217 (11th Cir. 1991); Critchfield v. Astrue, 2009 WL 635698 (N.D. Fla. Mar 10, 2009) (No. 308cv32-RV/MD).  Consequently, the opinion of Dr. Agens must now be accepted as true.  That opinion is consistent with the consultative opinion of Dr. Mauro, that due to memory impairments and painful diabetic neuropathy, Plaintiff is unable to perform any sort of work in a competitive work environment.  If the court adopts this recommendation, the other arguments presented by Plaintiff need not be considered.

**Conclusion**

Considering the record as a whole, the findings of the Administrative Law Judge were not based upon substantial evidence in the record and did not correctly follow the law.  The decision of the Commissioner to deny Plaintiff's application for benefits should be reversed and benefits should be awarded.

Accordingly, it is **RECOMMENDED** that the decision of the Commissioner to deny Plaintiff's application for Social Security benefits be **REVERSED** and the Commissioner be **ORDERED** to grant Plaintiff's applications for benefits.

**IN CHAMBERS** at Tallahassee, Florida, on October 6, 2010.


**s/     William C. Sherrill, Jr.**
**WILLIAM C. SHERRILL, JR.**
**UNITED STATES MAGISTRATE JUDGE**


**<u>NOTICE TO THE PARTIES</u>**

**A party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 14 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**